IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA**, | **CRIMINAL INDICTMENT** |
| Plaintiff, | **NO. 1:13-CR-18-TWT** |
| v. | |
| **PATRICK RANDELL MCINTOSH** | |
| Defendant. | |

## FINAL REPORT AND RECOMMENDATION AND ORDER

Defendant Patrick McIntosh ("Defendant") is charged with receiving firearms and ammunition while under indictment for a felony (Count One) and making a threat on the life of the President of the United States (Count Two). Pending before this court are Defendant's Motion to Suppress Evidence, Motion to Allow Participation in Voir Dire and Motion to Suppress Statements [Docs. 37, 38, and 39]. The Motion to Allow Participation in Voir Dire is hereby **DEFERRED** to the Honorable Thomas W. Thrash. An evidentiary hearing on the suppression motions was held before me on September 9, 2014. All transcript references are to the transcript of that hearing. For the reasons discussed below, I recommend that Defendant's Motions to Suppress Evidence [Doc. 37] be **GRANTED IN PART AND DENIED IN PART** and that his Motion to Suppress Statements [Doc. 39] be **GRANTED**.

AO 72A
(Rev.8/82)

**I.     FACTS**

    **A.     Search of Defendant's Room at the Intown Suites**

On October 4, 2012, deputies with the Gwinnett County Sheriff's Office had a temporary protective order ("TPO") and a Fulton County warrant for misdemeanor stalking for Defendant. (Tr. 25-7; Gov. Ex. 1). The warrant described the crime as contacting another person at her job by email and sending her flowers without her consent for the purpose of harassing and intimidating her. (Gov. Ex. 1). The stalking victim had applied for and obtained the TPO. (Tr. 33).

The deputies had learned that Defendant was staying in a particular room at the Intown Suites, an extended stay motel in Gwinnett County. (Tr. 28-9, 73). Deputy Perlaza of the Fugitive Unit went to the motel around noon, and watched the room and the parking lot until 4:00 p.m. Deputy Lee and other deputies with the Family Violence Unit went to relieve Deputy Perlaza around 4:00 p.m. Deputy Perlaza told Deputy Lee that Defendant was not present at the motel. (Tr. 26, 30, 44-5).

Earlier in the day, Deputy Lee's lieutenant had prepared a "threat matrix" with respect to Defendant that gave Defendant a high score. (Tr. 33). There were notes on the threat matrix that Defendant had mentioned "suicide by cop" and that he was heavily armed. (Id.).

2

The deputies knew what type of vehicle Defendant had been driving and did not see his vehicle in the parking lots adjacent to the motel. The deputies stayed to conduct surveillance of Defendant's room and around the motel. (Tr. 29-30, 67-68).

Around 5:00 p.m., the deputies went to Defendant's room for a closer inspection. They saw movement behind a window (located immediately to the left of Defendant's door) that they believed belonged to Defendant's room. (Tr. 30, 59). The deputies had one of the motel housekeepers come to the room and announce "housekeeping" to try to get Defendant to come to the door. However, no one came to the door. (Tr. 59, 70). The housekeeper then opened the door with a key card and the deputies entered the room. (Id.).

As soon as the door was opened, the deputies realized, based on the location of the wall dividing the motel rooms, that the window through which they had observed movement was not the window to Defendant's room. (Tr. 31, 59, 71). They also immediately saw a shotgun propped against a closet wall. (Tr. 30-31, 69). The deputies then searched the room and found one pistol in a dresser drawer and a second pistol under the bed. (Tr. 32, 60, 69). All of the firearms were loaded. (Tr. 31-2). The deputies also found boxes of assorted ammunition in the room. (Tr. 37). One of the deputies unloaded all of the firearms and placed the ammunition in a different location

AO 72A
(Rev.8/82)

in the room that would not be visible to someone entering the room. (Tr. 32). The deputies left the firearms and the ammunition in the room. (Id.).

### B. Defendant arrives in his van and is arrested

Around 7:30 p.m. Defendant drove up to the motel in his van. He parked near his room, got out, opened the front passenger side door, and leaned in as if he were going to retrieve something from the van. (Tr. 33-4). The deputies approached Defendant at gunpoint, gave him verbal commands not to move, and placed him under arrest. (Tr. 34). One of the deputies looked through the windows of the van with a flashlight in order to make sure no one else was in the van. He saw a box of shotgun shells through the window after Defendant had been taken into custody. (Tr. 49, 51). After Defendant was arrested, handcuffed and placed in a police vehicle, the deputies searched Defendant's van and retrieved the box of shotgun shells from the back of the van. (Tr. 35, 47-49). Defendant's vehicle was not impounded. [Doc. 47].

### C. After Defendant was arrested, the deputies took custody of the firearms and ammunition from the motel room at the request of the manager

After Defendant was arrested, Deputy Lee told the manager of the Intown Suites that Defendant had been arrested and he didn't know if or when Defendant was coming

back. Deputy Lee told the manager about the weapons and ammunition in the room and asked her what she wanted done with them. The manager told Deputy Lee to take the weapons and ammunition and hold them for safekeeping, and the deputies did so. (Tr. 78).

### D.   Defendant's Statements to FBI Agents

On November 21, 2012, Special Agents Darren Flinn and Chris Wolfe of the United States Secret Service attempted to interview Defendant while he was in custody in the Charleston County (South Carolina) Detention Center. (Tr. 19; Def. Ex. 8). Defendant was being held in that Detention Center on South Carolina charges for stalking. (Tr. 19). Defendant told the agents that he wanted to have his attorney present for any questioning and the Secret Service agents left without questioning him. (Def. Ex. 8).

On November 30, 2012, the FBI executed a search warrant at the residence of Defendant's mother in Charleston, South Carolina. Secret Service Special Agents Flinn and Wolfe accompanied the FBI search team in order to interview Defendant's mother. (Tr. 10). During the execution of the search warrant, the Secret Service Agents told the FBI agents, including FBI Special Agent Clinton Pierce, "Good luck speaking with Mr. McIntosh, he didn't want to speak with us." (Tr. 10-11). Agent Pierce assumed that

Defendant had invoked his right to remain silent with the Secret Service Agents. (Tr. 13).

On December 7, 2012, a Magistrate Judge in Atlanta signed a criminal complaint against Defendant that charged him with receiving firearms while under indictment for felony stalking in South Carolina and threatening the President of the United States on Facebook. [Doc. 1].

On December 18, 2012, FBI Special Agent Pierce went to arrest Defendant who was still in pre-trial custody in the Charleston County Detention Center. Agent Pierce read the federal charges to Defendant and advised him that he knew that he had told the Secret Service Agents that he did not want to speak to them. (Tr. 10). Agent Pierce thought that Defendant was interested in the federal charges and testified that Defendant "started to express, in my opinion, that he wanted to hear more about them." (Tr. 11). However, Agent Pierce did not testify to any actual statements made by Defendant that initiated a conversation with the FBI agents or that expressed his interested in learning more about the charges. Agent Pierce told Defendant that they would have to go through the Miranda waiver if he wanted to hear about the charges and talk more about them. (Tr. 9-10).

Agent Pierce then gave Defendant his Miranda warnings and Defendant signed a waiver of his Miranda rights. (Gov. Ex. 3). Defendant then went on to make statements regarding the charges that the government plans to use against him in this case. (Tr. 15).

## II.   DISCUSSION

### A.   Search of Defendant's Motel Room

Defendant argues that the items found in his motel room must be suppressed because (1) the deputies did not have reason to believe that Defendant was present in the motel room at the time they entered; (2) even if the deputies were authorized to open the door based on the movement they saw through the window, they immediately realized that the movement was in a different room and thus had no authority to continue their search of Defendant's room; and (3) even if the entry into the room was valid, the search of the dresser drawer was not. [Doc. 51 at 5-8].

In Payton v. New York, 445 U.S. 573 (1980), the Supreme Court stated: "[F]or Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." As a result, Payton requires a two-part inquiry: First, there must be a reasonable belief that the location to be searched is the

7

suspect's dwelling, and second, the police must have "reason to believe" that the suspect is within the dwelling.  United States v. Magluta, 44 F.3d 1530, 1533 (11th Cir. 1995). Defendant does not dispute that the deputies had a reasonable belief that the room the deputies entered at the Intown Suites was his dwelling.  However, he argues that they did not have a reason to believe that he was in the room at the time that they entered it. The court disagrees.

Magluta dictates that courts apply a common sense approach to determining whether a police officer has the requisite "reasonable belief."  Having reviewed the testimony and photographs depicting the layout of the room and the adjoining window, I find that the deputies initially had a reasonable belief that there was movement in the Defendant's room, and thus a reasonable belief that he was present in the room. Therefore, they were authorized to enter to conduct the arrest.  As soon as they entered, they saw the shotgun.  Therefore, they were lawfully in the room when they saw the shotgun, and nothing prohibits their testimony about their observation of the shotgun.

As stated above, after Defendant was arrested, the hotel manager requested the deputies to take the shotgun (and other weapons and ammunition) found in Defendant's room and hold them for safekeeping. The motel management could not reasonably have been expected to permit firearms and ammunition to remain indefinitely in a motel

room that had just been vacated by the Defendant's arrest. Moreover, the deputies had an objectively reasonable good faith belief that the Defendant's room had been vacated and that they had obtained valid consent from the management to take custody of any items in the room. See United States v. Mercer, 541 F.3d 1070, 1074-75 (11th Cir. 2008)(holding that, where an officer may reasonably believe that occupant's control of a motel room has been reverted back to the motel following the occupant's arrest, the officer may rely on the motel manger's consent to enter the room, despite the general rule from Stoner v. California, 376 U.S. 483 (1964), that a hotel employee may not consent to the search of a rented room); United States v. Brazel, 102 F.3d 1120, 1148 (11th Cir. 1997)(finding that court was justified in refusing to suppress evidence where the officer seizing the evidence had an objectively reasonable good-faith belief that the premises were vacant and he had obtained valid consent for the search from the landlord). Thus, because the deputies learned of the shotgun through a lawful entry, and later took possession of it at the request of the motel management, the evidence of the shotgun should not be suppressed.

On the other hand, the deputies did not see the pistols and the ammunition when they entered the Defendant's room. They were found in a search of the room only after

the deputies realized that the movement they saw through a window was in a different room.

When an officer is arresting an individual in his home, the officer may engage in a warrantless "protective sweep" to ensure that the surrounding area does not pose a danger to the officer. United States v. Delgado, 903 F.2d 1495, 1502 (11th Cir. 1990) (citing Maryland v. Buie, 494 U.S. 325, 334 (1990)). A protective sweep throughout a residence must be supported by "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." Buie, 494 U.S. at 334. The government argues that the deputies were lawfully conducting a protective sweep of the Defendant's room. [Doc. 52 at p. 11].[1] However, the pistols and ammunition were found after the deputies no longer had any reason to believe that Defendant (or anyone else) was in the room. Thus, they had no basis to conduct a protective sweep of the room. See United States v. Chaves, 169 F.3d 687, 692 (11th Cir. 1999) ("[I]n the absence of specific and articulable facts showing that another individual, who posed a danger to the officers or others, was inside the warehouse, the officers' lack of information cannot justify the warrantless sweep in this

---

[1] Law enforcement were advised by the Intown Suites manager that Defendant was staying at that location and told the deputies which room was his. (Tr. 28-9).

case."); see also United States v. Moran Vargas, 376 F.3d 112, 117 (2d Cir. 2004) (citing cases and holding that "lack of information cannot justify a protective sweep"); United States v. Roof, 103 F.App'x. 652, 658 (10th Cir. 2004) (noting that uncertainties as to whether anyone remained in the home did not justify protective sweep); United States v. Reynolds, 526 F.Supp.2d 1330, 1339 (N.D. Ga. 2007) (finding no specific and articulable facts to uphold a protective sweep).

For these reasons, the deputies had no legal authority to search Defendant's room. The two pistols and ammunition were found during an unlawful search of Defendant's room and should be suppressed.[2]

### B.     Shotgun Shells Found in Defendant's Van

As set forth above, one of the deputies saw a box of shotgun shells in Defendant's van after the arrest by looking through the windows of the van with a flashlight in order to make sure no one else was in the van.  Using a flashlight to illuminate the interior of a car does not implicate the Fourth Amendment. See Texas v. Brown, 460 U.S. 730,

---

[2] The government does not argue, and I have no basis to find, that inevitably the two pistols and ammunition would have been found by the motel management and turned over to law enforcement along with the shotgun even if the deputies had not alerted management to their presence.  Furthermore, even if the deputies had been looking for persons in the room, they had no basis to search a dresser drawer, the location of one of the pistols.

11

739-40 (1983)(plurality opinion).  Therefore, there is nothing to prohibit the deputy from testifying about his observation of the box of shotgun shells inside Defendant's van.  See Arizona v. Hicks, 480 U.S. 321, 324 (1987)(the mere recording of what an officer saw in plain review did not constitute a seizure).

A more difficult question is whether the deputies were authorized to seize the box of shotgun shells.  The deputies did not go inside the van to search it until after Defendant had been arrested, handcuffed and taken away from the van to a police vehicle. (Tr. 47-48).  The government argues that the search was a valid search incident to arrest.  Defendant argues that the search was prohibited by Arizona v. Gant, 556 U.S. 332 (2009).  In Gant, the Court held that a search incident to arrest, following an automobile stop, is permissible if either (1) it is reasonable to believe that the arrestee might access the vehicle at the time of the search, or (2) if it was "reasonable to believe" that the car contained evidence of the offense of the arrest.  Gant, 556 U.S. at 335.

The government first argues that it was reasonable to believe that Defendant might access his van at the time of the search because the deputies had begun looking through the windows of the van at the same time that they were arresting Defendant. The government reasons that the " 'search' " (looking through the windows) actually began while Defendant was still next to the car and in arm's reach of what was inside.

12

[Doc. 52 at p. 13]. I reject this argument, because looking through the windows from the outside was not a search. The search did not begin until Defendant had been secured and taken away from his van.

Next, the government argues that regardless of Defendant's proximity to the van, a search was still permissible under the second prong of Gant because the deputies had reason to believe that evidence of the crime of threatening the President would be found in Defendant's vehicle. [Doc, 52 at p. 14]. The problem with this argument is that, at the time of the vehicle search, Defendant was not being arrested for threatening the president. He was being arrested for misdemeanor stalking. Indeed, there is no evidence that deputies (or any other law enforcement official) had evidence at the time of the vehicle search that Defendant had threatened the president. The government makes no argument that the box of shotgun shells was actual evidence of the crime of arrest, misdemeanor stalking.[3]

---

[3] The government makes no argument that the box of shotgun shells could be seized under the "plain view doctrine." See Horton v. California, 496 U.S. 128, 136-37 (1990) (determining that it is not a violation of the Fourth Amendment to seize objects that are in plain view of the officer, so long as he is lawfully in the place where the evidence is viewed and its illegal or incriminating nature is immediately apparent).

The government also makes no argument (and there is no evidence) that there was an inventory search of Defendant's vehicle.

### C.     Statements to FBI

In Edwards v. Arizona, 451 U.S. 477 (1981), the Supreme Court held that, once a suspect has invoked his right to counsel, custodial interrogation must cease unless an attorney is present or the suspect reinitiates contact with the investigators. Edwards, 451 U.S. at 485-86. Once a suspect has asked for the assistance of counsel, "it is presumed that any subsequent waiver that has come at the authorities' behest, and not at the suspect's own instigation, is itself the product of the 'inherently compelling pressures' [of custodial interrogation] and not the purely voluntary choice of the suspect." Arizona v. Roberson, 486 U.S. 675, 681(1988)(applying Edwards even where a different officer, who did not know about the suspect's previous request for counsel, interrogated him about a different, unrelated charge). Roberson made clear that the Edwards protection is not offense-specific. Rather, a suspect who has requested the presence of counsel cannot be questioned concerning any crime, not just the one that put him in custody. See Roberson, 486 U.S. at 683–84.

Here, Defendant had invoked his right to counsel when he was approached by the Secret Service Agents on November 21, 2012, while in custody in the Charleston County Detention Center. The FBI approached Defendant on December 18, 2012, while he was still in custody in the Charleston County Detention Center. The

14

government first argues that the FBI agents did not violate Edwards because Defendant initiated the conversation with the FBI. I find that the government has not met its burden of proof as to this argument. Agent Pierce's testimony was vague as to what actually occurred. As set forth above, Agent Pierce testified that after he advised Defendant of the federal charges Defendant "started to express, in my opinion, that he wanted to hear more about them." (Tr. 11). However, Agent Pierce did not testify to any actual statements made by Defendant that supported his opinion. This evidence is not enough to meet the government's burden of proof that Defendant initiated the conversation with the FBI agents.

The government next argues that under Maryland v. Shatzer, 559 U. S. 98 (2010) there was not violation of the rule of Edwards because there was a break in custody of more than two weeks between the interrogations. (Doc. 52 at p. 16). In Shatzer, the Court created a narrow exception to Edwards, holding that a defendant who is released from custody for a period of at least fourteen days loses the protection that Edwards provides to suspects who invoke the right to counsel. Id. at 111-12. The Shatzer Court also decided that a prisoner "subject to a baseline set of restraints imposed pursuant to a prior conviction" is not in custody for Miranda purposes. The government argues that

15

because the two interrogations were separated by 27 days, Shatzer applies and there was no Edwards violation.

However, as Defendant points out, while there were 27 days between the interrogations, there was no break in Defendant's custody. Defendant was in pre-trial custody the entire time. Shatzer made clear that its holding did not apply to individuals who were continually in pre-trial detention between interrogations. It described the "paradigm Edwards case" as one in which "the suspect had been arrested for a particular crime and is held in uninterrupted pretrial custody while that crime is being actively investigated." Shatzer, 559 U.S. at 106. Thus, for reasons argued by Defendant, I reject the Government's argument that Shatzer creates an exception to the general Edwards rule in the circumstances of this case. Because Agent Pierce questioned Defendant after he invoked his right to counsel, and the government has not met its burden of showing that Defendant initiated that conversation, all of Defendant's statements to Agent Pierce on December 18, 2012, must be suppressed.

### III. CONCLUSION

In sum, I **ORDER** that the Motion to Participate in Voir Dire [Doc. 38] be **DEFERRED** to the District Judge.

AO 72A
(Rev.8/82)

I **RECOMMEND** that Defendant's Motions to Suppress Evidence [Doc. 37] be **GRANTED IN PART AND DENIED IN PART**.  Specifically, I recommend that evidence of the shotgun (and ammunition in the shotgun) found in Defendant's room not be suppressed but that evidence of the other firearms and ammunition found in the room be suppressed.  I recommend that law enforcement witnesses be allowed to testify about their observation of shotgun shells in Defendant's vehicle, but that the actual shotgun shells seized from the vehicle be suppressed.  I **RECOMMEND** that Defendant's Motion to Suppress Statements [Doc. 39] be **GRANTED**.

There are no pending matters before me, and I am aware of no problems relating to the scheduling of this case for trial.  It is therefore **ORDERED AND ADJUDGED** that this action be declared **READY FOR TRIAL**.

IT IS SO ORDERED this 17th day of December, 2014.

*Gerrilyn G. Brill*
GERRILYN G. BRILL
UNITED STATES MAGISTRATE JUDGE